UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| DANIEL ONEIL RUFFIN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:11-cv-00022-NT |
| | ) | |
| COMMISSIONER, MAINE DEPARTMENT | ) | |
| OF CORRECTIONS, et als., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION**

Daniel O'Neil Ruffin was a prisoner at the Downeast Correctional Facility in Machiasport, Maine, from July 2009 to November 2010. He has sued Carol Geel, the program manager at the Facility, Scott Jones, the facility director, and Martin Magnusson, the former commissioner of the Maine Department of Corrections. The dispute centers on Ruffin's request to be allowed to perform a weekly Muslim religious service in the facility's chapel area, the classification conference room, or the gym. Because of staffing concerns, Ms. Geel denied the request, but offered to attempt to accommodate Ruffin's religious practice in another way. Dissatisfied with her response, Ruffin filed grievances with prison officials and was rebuffed by Jones and Magnusson during the process. Ruffin has since been transferred to the Maine State Prison where staffing concerns do not interfere with his need to conduct "community" religious services. Ruffin seeks monetary damages and declaratory relief. The defendants have filed a motion for summary judgment (Doc. No. 34), which the Court referred for recommended decision. I now recommend that the Court grant the defendants' motion.[1]

---

[1] On December 14, 2011, Ruffin filed what he described as a cross-motion for summary judgment. (Doc. No. 41). The "cross-motion" was filed after the deadline for filing dispositive motions set forth in the scheduling order and failed to conform to District of Maine Local Rule 56. In effect Ruffin's "cross-motion" for summary judgment was in the nature of a surreply consisting of Ruffin's affidavit containing arguments as to why the

**STATEMENT OF MATERIAL FACTS**

The non-moving party is entitled to have the summary judgment facts considered in the light most favorable to his cause. Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011). By local rule, summary judgment facts are introduced by means of "a separate, short, and concise statement of material facts," which statements must be supported by record citations. D. Me. Loc. R. 56(b), (c). The Court's review of the record is guided by the moving party's statement, the non-moving party's opposing statement, including any additional statement, and the moving party's limited reply statement. D. Me. Loc. R. 56(b), (c), (d); see also Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). The following statement is drawn from Defendants' Statement of Material Facts (Doc. No. 31), Plaintiff's Affidavits in Opposition (Doc. Nos. 39 & 41), and Defendants' Reply through the Affidavit of Carol Geel (Doc. No. 40-1).[2]

Carol Geel is currently employed as a program manager at the Downeast Correctional Facility in Machiasport. At the time of the events alleged in the complaint, she was employed as a case worker at the Facility and she was plaintiff Daniel Ruffin's case worker. Ruffin was incarcerated there from July 2009 to November 2010. During that time Ruffin was the only prisoner at the facility who professed a belief in the faith of Islam, and he was the only prisoner who asked for an area in which to conduct a Muslim religious service. On September 29, 2009,

---

defendants' reply to his responsive affidavit and exhibits was inadequate. I terminated the motion because there was no reason for the defendants to attempt to respond to it. However, I have read the "cross-motion" and I am cognizant of the arguments Ruffin raised therein. Ruffin has appealed from that order.

[2] Ruffin has not complied with the strictures of Local Rule 56, which in turn forced the defendants to file a nonconforming reply and led to Ruffin's aborted "cross-motion" in the nature of a surreply. In the context of prisoner litigation in this District, special care must be taken with a prisoner's pro se filings in opposition to a motion for summary judgment. This Court has observed that a prisoner's nonconforming summary judgment submission should be reviewed by the Court and facts set forth in a verified complaint or prisoner affidavit should be considered when examining the entire summary judgment record. Clarke v. Blais, 473 F. Supp. 2d 124, 128 (D. Me. 2007). Accordingly, I have not presented these facts as deemed admitted, and I have noted the factual disputes Ruffin claims exist.

Ruffin asked Geel to be allowed to conduct a Friday afternoon religious service in the chapel area, classification room, or the gym. These are common areas of the Facility used at various times for religious services by prisoners. When discussing the request with Geel, Ruffin made it clear that he wished to conduct his service without any supervision by prison staff.

It is a policy of the Facility that all religious services be supervised either by prison staff or an outside volunteer conducting the service. It is also a policy at the Facility that prisoners be supervised when they are in the common areas of the prison, such as the visiting area, the chapel, the gym and the classification conference room. The policies regarding supervision of prisoners are basic to the security and orderly management of the facility and are intended to deter and prevent misconduct by the prisoners. Geel explained to Ruffin that he would not be allowed to conduct a religious service unsupervised in a common area of the prison. In an effort to accommodate Ruffin's desire to conduct a Friday afternoon religious service, Geel spoke with Ruffin's dormitory roommate and asked him if he would be willing to vacate the room during the time that Ruffin wanted to conduct his service. The roommate agreed to do this, but Ruffin refused to agree to this arrangement. Rather, he insisted that he be allowed to conduct a religious service, unsupervised, in a common area of the facility. Although Ruffin did not request to conduct a religious service in a common area under supervision, Geel would have recommended that such a request be denied if it had been made. It would be impracticable, given the staffing levels at the Facility, to assign an officer to supervise a single prisoner for an extended time.

Geel believed that allowing Ruffin to conduct his religious service in the privacy of his room reasonably accommodated his professed religious beliefs. Geel reviewed Ruffin's request with Scott Jones, the director of the Facility, who denied the request. Jones's decision was upheld upon review by the Commissioner. Ruffin was transferred from the Facility to the Maine

3

State Prison in Warren on November 10, 2010.  There are a number of Muslims among the inmate population at the state prison and services are conducted there regularly.

In his responsive affidavit Ruffin does not effectively deny any of the facts set forth above, but adds some additional facts.  He notes that Geel's response to his request was: "Pray in your room, your roommate Mark Reynolds has no problem with it."  Ruffin notes that he had a second roommate, John Paradis, who would not leave the room.  Ruffin also notes that he never asked to be unsupervised nor did he ever refuse to accept supervision at religious services, which he describes as Jum'ah services.[3]  Geel also admitted that Native Americans at the facility used the classification room for religious services during the time period from August to November 2010, while Ruffin was still housed at the Facility.  Geel refused to allow Ruffin to use the classification room for his services.  Geel was the only caseworker at the Facility during Ruffin's incarceration at the Facility.  She also functioned as a first-level grievance officer.

In her reply affidavit, Geel clarifies two points.  First, she indicates that Ruffin refused to accept her accommodation of using his room for Jum'ah services because, according to grievances, his room was "not a sanctuary or a place to hold religious services."  Second, Geel notes that John Paradis only became the second roommate several weeks after Ruffin had already refused the accommodation of having the roommate leave the room while Ruffin conducted his religious services.

---

[3] Jumʿah.  Friday of the Muslim week and the special noon service on Friday that all adult, male, free Muslims are obliged to attend. The jumʿah, which replaces the usual noon ritual prayer (ṣalāt aẓ-ẓuhr), must take place before a sizable number of Muslims (according to some legal scholars, 40) in one central mosque in each locality.

Encyclopædia Britannica. Encyclopædia Britannica Online Academic Edition. Encyclopædia Britannica Inc., 2012. Web. 09 Jan. 2012. <http://www.britannica.com/EBchecked/topic/308043/jumah>.

In his surreply affidavit, Ruffin explains that all Muslims from twelve years of age are obliged to attend the mosque for the Friday prayer and must leave their homes/living areas, businesses, and activities to attend Jum'ah. Ruffin reiterates that it is an undisputed fact that Geel also functioned as the grievance officer during the time in question. He notes that Jones, the director of the facility, corroborated Geel's initial response that all religious activities at the facility are supervised by staff or approved volunteers. He also notes that, according to Jones, Geel conducted research on Jum'ah but in spite of that fact the defendants refused Ruffin the right to attend Jum'ah services. Ruffin's second affidavit also makes much of the fact that Geel's affidavits were signed under penalty of perjury, with an electronic signature, rather than sworn before a notary who affixed a seal.[4]

## DISCUSSION

The defendants have moved for summary judgment on the following four grounds: (1) any restriction of Ruffin's First Amendment rights was reasonably related to legitimate penological interests under the test set forth in O'Lone v. Est. of Shabazz, 482 U.S. 342 (1987); (2) Ruffin's claim for declaratory relief against the officials at Downeast Correctional Facility is moot; (3) the claims against Geel and Jones are barred by qualified immunity; and (4) in the absence of physical injury, Ruffin fails to state a claim for compensatory or punitive damages under 42 U.S.C. § 1997e(e).

### A. Pleas for Declaratory Relief or Injunctive Relief Are Now Moot

Whether Ruffin's claims for declaratory relief are brought pursuant to the First Amendment free exercise clause through 42 U.S.C. § 1983 or envisioned under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc *et seq.*, those claims

---

[4] In federal court it is perfectly permissible for a witness to submit an affidavit under penalty of perjury, as the statutory alternative to an oath. 28 U.S.C. § 1746. The presence of a notary public is not required when employing this procedure.

have been rendered moot by Ruffin's transfer to the Maine State Prison where regularly scheduled Jum'ah services are held. Ruffin has not disputed that factual assertion set forth in the defendants' statement. Ruffin's transfer to a different facility where he is able to satisfy his need to attend Jum'ah services has rendered his claims for declaratory relief moot because he currently is suffering no continuing threat of repeated interference with his First Amendment rights. Shaheed-Muhammad v. Dipaolo, 138 F. Supp.2d 99, 101 (D. Mass. 2001).

**B.     There Are No Viable Official Capacity, Money Damages Claims Here**

If Ruffin has in mind that he can recover monetary damages against Magnusson or the other defendants, in their official capacities, he is mistaken under both RLUIPA and 42 U.S.C. § 1983. "States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver." Sossamon v. Texas, ___ U.S. ___, 131 S. Ct. 1651, 1663 (2011). Additionally, pursuant to § 1983, a state and its officers in official capacities are generally immune from suits for monetary damages. See Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985); Alabama v. Pugh, 438 U.S. 781, 782 (1978); Greenless v. Almond, 277 F.3d 601, 606-607 (1st Cir. 2002).

**C.     Personal Capacity Claims Arise Under § 1983, And Qualified Immunity Applies**

Individual state actors are subject to liability in damages under the Civil Rights Act for acts that deprive others of a federal constitutional or statutory right, 42 U.S.C. § 1983, but the Supreme Court's opinions "consistently have held that government officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "In the last

6

analysis, . . . qualified immunity purposes to protect government functionaries who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct." Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999). In this way, the doctrine of qualified immunity protects a state actor from liability for money damages in circumstances where the proper application of the underlying federal standard is unclear and, therefore, not otherwise suited for dismissal or summary disposition.

With respect to the extent of the protection conferred by the doctrine, it has been said that the doctrine "leaves 'ample room for mistaken judgments' and protects 'all but the plainly incompetent or those who knowingly violate the law.'" Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The availability of qualified immunity turns on two considerations: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009). The second aspect of this test "focuses . . . on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). "[T]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

Former Commissioner Magnusson's role in these events appears to be limited to his review of the third-level grievance filed by Ruffin (Doc. 1-8). If Ruffin believes that Magnusson has personal liability, his complaint states neither a claim for supervisory liability nor a claim in

connection with Magnusson's role in ruling on the third-level grievance. Ruffin's discontent with the results of his grievance process does not support a stand-alone 42 U.S.C. § 1983 claim. See Lamon v. Junious, No. 1:09-cv-00484-GSA PC, 2009 WL 3248173, *4-5 (E.D. Cal. Oct. 8, 2009). Nor can Magnusson be held liable as the supervisor of Jones and Geel under § 1983 on a theory of *respondeat superior*. The First Circuit has observed: "It is by now axiomatic that the doctrine of *respondeat superior* does not apply to claims under section 1983." Gaudreault v. Salem, 923 F.2d 203, 209 (1st Cir. 1990). Former Commissioner Magnusson is entitled to judgment on the complaint because the complaint does not state a claim against him.

Geel and Jones are the two individuals who made the on-sight determinations regarding whether or not Ruffin could use prison "public" space such as the chapel, gym, or classification conference room for his religious services. Lest Ruffin assume that this recommendation is based on disputed factual issues, I draw all inferences in his favor and view the evidence most favorably to him, finding that all three prison spaces have been or could be used for religious services; that Ruffin never indicated that he objected to prison officials supervising his religious services; and that his later-acquired, second roommate would have objected to leaving the room. I note, however, that on this record the roommate concern arose after Ruffin had made it clear to prison authorities that using his room for this religious purpose was not a viable option based on his belief about the nature of Jum'ah service, regardless of whether the prison officials could have provided him with privacy in the room. In other words, the prison officials sued here were never afforded an opportunity to instruct the second roommate to leave because Ruffin rejected entirely the idea that his room was an appropriate venue for Jum'ah service.

Whether Ruffin's constitutional challenge under 42 U.S.C. § 1983 arises under the First Amendment's Free Exercise Clause or the Fourteenth Amendment's Equal Protection Clause,

8

the Supreme Court's O'Lone v. Estate of Shabazz opinion supplies the standard that guides the Court's inquiry. 482 U.S. 342, 348-50 (1987). The equal protection challenge is circumscribed because prison officials are not required "to treat all inmate groups the same when differentiation is necessary to avoid a threat to prison security." Kruperman v. Wrenn, 645 F.3d 69, 78 (1st Cir. 2011). While acknowledging that prisoners do not forfeit all constitutional protections by reason of their incarceration, the Supreme Court has embraced the Turner v. Safley, 482 U.S. 78, 89 (1987), reasonableness test when prison regulations impinge on an inmate's First Amendment religious freedoms. Turner sets forth a four-prong inquiry to determine if the policy in question is constitutionally reasonable: (1) "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) it must be considered whether the regulation allows for "alternative means of exercising the rights that remain open to prison inmates"; (3) the impact that the requested accommodation of the asserted constitutional right will have on prison resources, guards, and other inmates must also be weighed and, when significant, "courts should be particularly deferential to the informed discretion of corrections officials"; and (4) it should be considered what the presence or absence of "ready alternatives" says about the prisoner's requested accommodation and the state's response to it. Id. at 89-91.

That prison security is a legitimate governmental interest and that having guards available to supervise a prisoner's activities has a valid connection to security is obvious and easily satisfies the first prong of the inquiry. Likewise it is apparent on these facts that allocation of prison resources generally would be skewed if a guard were used solely for one-on-one supervision of an inmate for the extended period of a religious service. Native American religious groups, apparently consisting of more than one inmate, are allowed to use the

9

conference room for their services, but that differentiation is certainly justified based on the fact that more than one inmate participates in those services. The evidence does not support the conclusion that Ruffin was denied the use of the same room because of his religion, but rather it was because of allocation of guards for purposes of supervision. There is also no question but that there are valid alternative means for Ruffin to exercise many of his religious rights, although the Jum'ah service is alleged to be integral to his belief and cannot be held in the desired space under the circumstances presented by these facts. The alternative put forth by Geel, that Ruffin conduct his religious service in the privacy of his own room, was apparently anathema to his religious belief because of the need to leave his "home" and attend services in a place akin to a mosque. However, Geel did attempt to propose a reasonable alternative under the circumstances. Furthermore, the record reveals that Ruffin's transfer to the Maine State Prison where other Muslims also reside has apparently provided a viable solution to the problem.

I do not believe that there has been a violation of either Ruffin's constitutional or statutory rights. However, even if the correctional facility had some affirmative statutory or constitutional obligation to provide Ruffin with adequate nonliving space to conduct a one-person Jum'ah religious service, under existing First Circuit precedent addressing religious accommodation, including the 2011 Kruperman opinion, a reasonable correctional officer in the position of Geel and/or Jones would not have known that his or her conduct on these facts violated Ruffin's right by creating a substantial burden on his religious freedom in the absence of a compelling governmental interest. Under the qualified immunity doctrine, even if a state government official acts in such a way as to deprive a person of a constitutional right, that official is entitled to qualified immunity from damages claims if a reasonable official in the same

circumstances could have believed that he was not violating a clearly established constitutional right. Harlow, 457 U.S. at 818.

It may be assumed that Geel and Jones were aware that Ruffin had a clearly established right to practice his religion. They would also be cognizant that governmental interests of institutional safety and security and the proper allocation of scarce resources were compelling interests. They attempted to reasonably balance those competing interests by offering what they viewed as a reasonable accommodation: providing Ruffin with a private room in which to perform his services, Ruffin being the only practicing Muslim in the Facility.

The state of the law throughout the country regarding the imposition of substantial burdens on an inmate's free exercise of religion is lacking in clarity. For instance, the defendants cite Jihad v. Fabian, 680 F. Supp. 2d 1021 (D. Minn. 2010), a case where the prisoner alleged that certain policies of the prison infringed his right to practice his religion of Islam. The court noted that requiring Muslim services to be supervised by an approved volunteer did not impose a substantial burden on the inmate's free exercise of his religion. The prisoner also argued that the prison violated his First Amendment rights by requiring him to pray in his cell, despite the presence of a toilet there (which, the inmate asserted, made the location unsuitable for prayer). The court did agree that this requirement imposed a substantial burden on the prisoner's exercise of his religion, but the court also accepted the justification proffered by prison officials that allowing inmates to leave their cells five times a day for prayers would adversely affect the ability of the prison to control inmates' movements. Reasoning by analogy, it is fair to assume that it was not unreasonable for these defendants to conclude that, even if prohibiting Ruffin from conducting his Jum'ah service in the prison location of his choice imposed a substantial burden, it was justified by the compelling interest in maintaining prison security and allocating

11

personnel resources effectively. The facts and rationale of Jihad are remarkably similar to the facts presented by this case. If a federal judge concludes that requiring prison personnel to be present for services and requiring prayers to take place in a cell are reasonable approaches to balancing the competing interests, the defendants in this case were certainly acting reasonably in response to Ruffin's request. The judge in Jihad noted that the policies at issue satisfied RLUIPA's strict scrutiny test and therefore necessarily satisfied the rational basis test applied for First Amendment purposes. Id. at 1026.

**D.    There is No Viable RLUIPA Personal Capacity Claim for Money Damages[5]**

Ruffin does not indicate in his complaint that his action is brought pursuant to RLUIPA and he appears to rely entirely upon 42 U.S.C. § 1983 as the vehicle for his claim for monetary damages. The issue of RLUIPA's application has not been briefed by either party, but the Jihad case, cited by the defendants, highlights the differing considerations under the First Amendment and RLUIPA. I am satisfied that the qualified immunity analysis discussed above would apply with equal force to a standalone RLUIPA claim, if the Court believes that the complaint should be considered separately under RLUIPA. However, assuming that a claim for monetary damages against an individual exists under RLUIPA and assuming that qualified immunity is not available to individual defendants in the statutory context (two major assumptions, as the case law set forth below demonstrates), I would conclude under the facts set forth in this record, including Ruffin's current ability to engage in his religious services, that the defendants are entitled to judgment in any event because these facts do not demonstrate a compensable claim for monetary damages under RLUIPA.

---

[5]    RLUIPA imposes a more demanding standard on the states than the First Amendment/O'Lone standard discussed in Section C of this Recommended Decision. See Kruperman, 645 F.3d at 80 (discussing the heightened burden required under RLUIPA because state officials must demonstrate not only that the regulation furthers a compelling government interest, but also that the challenged regulation was the least restrictive means available to further that interest).

The First Circuit has specifically reserved the issue of whether a prisoner can maintain a claim for money damages under RLUIPA against prison personnel in their personal capacities. Kruperman, 645 F.3d at 79.  However, four circuit courts have held that RLUIPA does not authorize suits for money damages against government officials in their individual capacities. See Nelson v. Miller, 570 F.3d 868, 886-89 (7th Cir. 2009); Rendelman v. Rouse, 569 F.3d 182, 187–89 (4th Cir. 2009); Sossamon v. Texas, 560 F.3d 316, 327-29 (5th Cir.2009), aff'd on other grounds, Sossamon v. Texas, ___U.S.___, 131 S. Ct. 1651, 1663 (2011); Smith v. Allen, 502 F.3d 1255, 1271–75 (11th Cir.2007).  Another circuit has suggested that, if a personal capacity claim for money damages is available under RLUIPA, then the doctrine of qualified immunity may be available to defendants sued in that capacity.  Ahmad v. Furlong, 435 F.3d 1196 (10th Cir. 2006).  Two panels of the Ninth Circuit, in unpublished opinions, have upheld the application of the doctrine of qualified immunity to bar claims under RLUIPA.  Campbell v. Alameida, 295 Fed. Appx. 130, 131 (2008); Von Staich v. Hamlet, Nos. 04-16011, 06-17026, 2007 U.S. App. LEXIS 24528, *6, 2007 WL 3001726, *2 (9th Cir. Oct 16, 2007).  Given the absence of clear direction from the First Circuit, the failure of either party to address this issue, and the fact that the prisoner's transfer has eliminated the problem, I do not recommend that this Court recognize a claim by Ruffin for money damages under RLUIPA, separate and distinct from his § 1983 claim for damages, especially since the facts surrounding these regulations do not support a clear violation under either the First Amendment standard or the heightened standard imposed by RLUIPA.

## CONCLUSION

Based upon the foregoing, I recommend that the defendants' motion be granted.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

January 12, 2012